[Civ. Nos. 31779, 31785. Second Dist., Div. One. Apr. 1, 1968.]

LOS ANGELES DODGERS, INC., Plaintiff and Appellant, v. COUNTY OF LOS ANGELES et al., Defendants and Respondents.

(Consolidated Appeals.)

O'Melveny & Myers, Pierce Works, Kendall R. Bishop, Philip P. Westbrook, Jr., and Girard E. Boudreau for Plaintiff and Appellant.

John D. Maharg, County Counsel, John D. Cahill, Deputy County Counsel, for Defendants and Respondents.

LILLIE, J.—These are consolidated appeals from judgments in two separate actions brought by Los Angeles Dodgers (referred to hereinafter as "Dodgers") for recovery of ad valorem property taxes paid under protest. The taxable years involved are 1963-1964 (No. 31779) and 1964-1965 (No. 31785). The subject property represents the land in the Chavez Ravine area conveyed by the City of Los Angeles to the Dodgers in 1959 (see *City of Los Angeles* v. *Superior Court*, 51 Cal.2d 423 [333 P.2d 745]) for the erection of a baseball park, since known as Dodger Stadium, and includes the playing field and the surrounding parking area. Excluded from consideration on these appeals is a recreational parcel, likewise conveyed by the city to the Dodgers, for which recovery of taxes paid was also sought but upon a different theory than here invoked. (See *Los Angeles Dodgers, Inc.* v. *County of Los Angeles,* 256 Cal.App.2d 918 [64 Cal.Rptr. 465].)

The matter was submitted for decision upon the administrative records of the two equalization hearings. In due course, and contrary to the contentions of the Dodgers below, the trial court found that there was "substantial competent evidence [before the local equalization agency in each instance] that the Assessor's method of determining the fair market value of the subject property was permissible, realistic, fair, reasonable, uniformly applied, and not in fraud, constructive or otherwise, of the rights of plaintiff." ██ Accordingly, and it is so conceded, the sole question before this court is whether the above "substantial evidence" finding is supported by the record adduced in each of the subject hearings. The concession is a proper one, since "the taxpayer has no right to a trial de novo in the superior court to resolve conflicting issues of fact as to the taxable value of his property. [Citations.]" (*Bank of America* v. *Mundo,* 37 Cal.2d 1, 5 [229 P.2d 345]), and hence "The issue before a reviewing court is whether there was substantial evidence before the board [of equalization] upon which its determination could have been founded." (*A. F. Gilmore Co.* v. *County of Los Angeles,* 186 Cal.App.2d 471, 476 [9 Cal.Rptr. 67].)

██ It seems to be further conceded by plaintiff-taxpayer that the assessor is not limited to any particular method in reaching his determination of the value to be placed upon the subject property. Thus, "subject to requirements of fairness

and uniformity, [he] may exercise his discretion in using one or more [of such methods]" (*De Luz Homes, Inc.* v. *County of San Diego,* 45 Cal.2d 546, 564 [290 P.2d 544]); too, as pointed out in the case just cited, upon approval by the board of equalization they are "reviewable only for arbitrariness, abuse of discretion, or failure to follow the standards prescribed by the Legislature." (P. 564.) Defendants' two valuation experts, deputies and appraisers in the assessor's office, took cognizance of the three generally accepted approaches to the problem before them; mention is made of such approaches in *De Luz* (pp. 563-564) which are referred to in the present case as (1) market data, (2) income capitalization and (3) replacement cost less depreciation. Both Mr. Crook, who testified as to the 1963-1964 taxable years, and Mr. Hayungs, who gave testimony as to the 1964-1965 period, either discarded or gave little weight to the first two of the above methods under the facts at bar; instead, they resorted to, or applied, the third approach to the issue here. The taxpayer's two experts, on the other hand, did not so limit themselves; while discarding (1), *supra,* they considered the income approach most significant. As to the land in its raw or undeveloped state, the result was a disparity of some $9,000,000 for the 1963-1964 period.[1] An even greater disparity resulted for the 1964-1965 period.[2] There appears to be no dispute that the 25 percent ratio of assessed value to market value prevailed generally during the subject taxable years, and hence such ratio is not challenged as inequitable; since the assessments here challenged represented the above percentage of the property's fair market value as fixed by the board, the disparity just mentioned was carried over to the taxes thereafter paid by plaintiff under protest.

It is not contended by plaintiff, its own appraisers having done so in part, that the replacement cost approach could not have been adopted or followed in the instant proceedings; rather, it is argued that the method thus used was improperly applied by both Crook and Hayungs. Thus, according to plaintiff, Crook's valuation was premised largely on a so-called "historical cost" basis which made use of data, either so old and obsolete or "padded," as to form no valid ground

---

[1]The experts for the taxpayer gave valuations of $3,657,981 and $3,-900,000, respectively, whereas Crook testified to a value of $13,878,000.

[2]While the land value opinions of the taxpayer's experts were $2,400,000 and $1,936,000, Hayungs reached the same valuation as Crook ($13,878,000).

for the ultimate determination made; too, he utilized some seven sales of parcels said to be wholly lacking in comparability. In the case of Hayungs, utilization was made of a variant of the method used by Crook, being referred to as the "replacement of substitution" approach, or the cost of replacing an equally desirable. substitute property; thereunder he selected for his "substituted" land numerous small parcels zoned "M" (industrial) lying in the industrial area nearby—such selection being justified upon the premise that the substitution was directed primarily toward the utilization of the subject property for a baseball park or stadium, and no other type of property could be considered. Since the property had previously been given a conditional-use permit (for baseball), zoned C-2 (commercial), his valuation included a 20 percent deduction from the normal industrial value otherwise; when asked how he arrived at the above specific percentage, he could not give any reasons therefor. The above contentions, generally summarized, constitute the main attack upon the judgment here challenged and, it is argued, show more than a mere conflict in the evidence which would otherwise make conclusive the findings embraced thereby. Instead, a gap of some nine million dollars in values being emphasized, the case is assertedly governed by the following statement of the law in *L. W. Blinn Lbr. Co.* v. *County of Los Angeles,* 216 Cal. 474, 482-483 [14 P.2d 512, 84 A.L.R. 1304] : " ' " 'A grossly inequitable and palpably excessive overvaluation" of property for taxation may be held constructively fraudulent' [citations]. In other words where, as here, it appears that the assessor and board of equalization both adopted a manifestly erroneous method, showing a gross overvaluation of the property to be assessed, such an act, although, of course, unintentional, amounts to a constructive fraud or the equivalent of a fraud on the rights of plaintiff." In such circumstances, it was there held, the court will interfere to prevent such gross overvaluation. Similar legal propositions are found in *Birch* v. *County of Orange,* 186 Cal. 736, 742 [200 P. 647], and *Mahoney* v. *City of San Diego,* 198 Cal. 388, 396-397 [345 P. 189]:

In *Alberts* v. *Board of Supervisors,* 193 Cal.App.2d 225, 231 [14 Cal.Rptr. 72], the three decisions above cited are distinguished from the facts presented in that case for the reason that they bore on the question of the over-assessment of the taxpayers' property as compared with similar property. May the same not be fairly said of the case at bar? It seems to be

agreed that the subject property with all its variables is unique in character; indeed, we may take judicial notice of the fact that at the time of the instant proceedings, it was (and, of course, still is) the only major league baseball stadium in Los Angeles County. How can it, therefore, be urged that *similar* property in the strict sense was over-assessed? It appears to us that the defendants' appraisers rendered an honest judgment of its worth based on methods, adopted in part (as shown above) by plaintiff's own valuation experts. Although plaintiff professes to recognize the applicability here of the "substantial evidence" rule, implicit in its argument is the contention that we should reweigh the evidence presented to the board and make an independent evaluation thereof. But "It was the function of the board to weigh the evidence and to determine what reasonable inferences were to be drawn from the facts in evidence." (*Best* v. *County of Los Angeles,* 228 Cal.App.2d 655, 661 [39 Cal.Rptr. 665].) Too, under this same "substantial evidence" rule we must view the evidence in a light most favorable to defendants, as prevailing parties, and are further enjoined to disregard evidence to the contrary. Accordingly, if such evidence is of ponderable legal significance which, in the present case, means the selection of a method of fixing market value that is fair, just and equitable (*Michael Todd Co.* v. *County of Los Angeles,* 57 Cal.2d 684, 697 [21 Cal. Rptr. 604, 371 P.2d 340]), we must affirm.

We summarize the testimony given by Crook. Before such recital, we point out that there are three parcels comprising the subject property: the main stadium site (235.68 acres), Lot 3, also referred to as Sod Hill (25.18 acres) and Lot 16 (0.42 acres). Crook first investigated the three accepted approaches to value heretofore mentioned. There being no market data in the absence of any sales hereabouts of major league stadiums, he discarded such method. The capitalization method was likewise discarded because there were no recent sales of baseball stadiums in the area. He accordingly adopted the replacement cost approach which was based on the assumption that the highest and best use was that to which it was then being devoted, namely, the playing of baseball. The improvements were valued at $15,273,000, which was more than that of one of plaintiff's appraisers ($14,966,825) and less than that of its other expert ($15,400,000). As to the land itself, he valued the three parcels as follows: main stadium site—$13,360,000; Sod Hill—$500,000; and Lot 16—$18,000.

With respect to the main stadium site, the value was apportioned as follows: $3,417,716 for land development cost of the undeveloped land which was appraised at $9,946,220 in its raw state, the latter being $42,200 per acre overall. The total land value of $13,878,000 when added to the improvement value of $15,273,000 represents the overall figure of $29,-151,000, the total value testified to by Crook.

Since there was no appreciable difference of opinion as to the value of the 25-acre parcel, the value thereof being fixed by one of plaintiff's experts at $440,650, and the same being true as to the value of improvements, the case turns in great part on the disparity existing as to the worth of the main site in its raw state. According to one of plaintiff's appraisers, it was worth $15,000 per acre, while the other appraiser fixed a value per acre of $17,500. Crook's appraisal of $42,200 per acre was based in substantial part on the sales of seven parcels of land, several of them industrial-zoned and one with the same zoning as plaintiff's, which realized approximately $42,000 per acre. The claim is made that there was no evidence whatever as to the comparability of such properties to the main site here. *County of Los Angeles* v. *Faus*, 48 Cal.2d 672, 678 [312 P.2d 680], is cited for the claim that sales in other tracts must have been sufficiently near in time, located sufficiently near the land to be valued and sufficiently alike in character and usability so as to make it clear that the tracts are comparable in value. But the same case holds, citing a text writer, that the trial judge in applying so vague a standard must be given a wide discretion in any determination of comparability. And, as observed in *Los Angeles etc. School Dist.* v. *Swensen*, 226 Cal.App.2d 574, 583 [38 Cal.Rptr. 214], "The trial judge is to adjudge what are 'comparables,' not the witnesses." Here the trial court having impliedly approved the use of such sales, the circumstances do not compel the conclusion that its ruling was erroneous as a matter of law.

As noted earlier, the contention is also made that Crook considered certain "historical costs" which were erroneously used as the basis for his opinion. Since a goodly portion of plaintiff's brief is devoted to the presentation of this particular claim, the measure of its treatment by this court should ordinarily correspond thereto. However, it appears that Crook expressly denied that this historical cost analysis had anything to do with his opinion of value. In light of the recognized rule that the evidence here must be viewed most favorably to defendants as the prevailing parties, we cannot

disregard such denial, particularly when the trial court has heretofore reached the conclusion that such was the fact. Significantly, it did so in a memorandum opinion which includes the statement that "The record shows that Crook used the cost or summation approach and not the 'historical cost' analysis in arriving at his estimate of value." (Cl. Tr. p. 184.)

As to the first of the taxable periods (1963-1964), therefore, we must conclude that there is evidence of sufficient substantiality to support the judgment appealed from.

With respect to the second taxable period (1964-1965), we similarly view the evidence of Hayungs, defendants' appraiser. He placed an overall value on the subject property of $29,411,000, of which $15,533,000 were allocated to improvements and $13,878,000 to the land. Of this figure last mentioned, the following allocations were made: main stadium site—$13,600,000; Sod Hill—$500,000; Lot 16—$18,000. After stating his reasons for the non-use of the two other accepted methods of fixing values, he adopted the cost or summation approach; it is also referred to as the "replacement by proximity of substitution" method. As in the instance of the 1963-1964 proceeding, there was no great difference of opinion as to the value of the improvements; indeed, Hayungs valued them at $15,533,000, less than the values given by plaintiff's experts ($16,563,000 and $16,975,000). It is with respect to the undeveloped land, as noted earlier, that the disparity is found. In accordance with the approach above adopted, Hayungs stated that value is correlated to the cost that would be incurred as of the tax date in replacing or duplicating the facility in the approximate location with comparable accessibility. This appraisal process or principle is accepted in the appraisal profession. (See The Appraisal Process, George L. Schmutz, p. 45 et seq.) Pursuant thereto, he considered the acquisition during the previous year of 23 parcels of land where the sales averaged $210,000 per acre. He also considered 32 other sales covering an area which constituted a cross section of the value of all classes and types of vacant property which would be necessary to acquire under the principle of substitution. After considering all value factors as to industrial properties in reasonable proximity and giving the greatest weight to those prices of the larger parcel transactions, the fair market value of industrial property as applicable to the property here was

$100,000 per acre. After making allowance for the possible limiting effect of the subject property's permissive use zoning over that of an unrestricted industrial zone, he allowed a 20 percent reduction which resulted in a valuation of $80,000 per acre for the level usable area of the main site. He then stated: "Parcel 'A,' then the main site comprising 235.68 acres, has a level usable area of 167 acres. Therefore, in relating the level area value of the . . . 'M' zoned properties, this site of 235.68 acres would have an indicated market value of $13,385,000."

As in the instance of Crook, complaint is made that Hayungs improperly considered sales of other properties not comparable; as applied to Hayungs' testimony, the sales were of small industrial parcels. But, as stated with respect to the Crook complaint, it was for the trial judge to determine whether the properties were comparable. See also *People* ex rel. *Dept. Public Works* v. *Silveira,* 236 Cal.App.2d 604, 622 [46 Cal.Rptr. 260], cited by the trial court in its memorandum decision, where the trial judge was upheld in permitting the jury to consider "numerous small sales of one acre or less" although the parcel condemned consisted of 260 acres.

It is finally contended that Hayungs arbitrarily took 20 percent off his extrinsic valuation to allow for the conditional use permit and could give no reason for fixing the reduction percentage. Such deductions or reductions have been approved by our Supreme Court in related cases. (See *County of Riverside* v. *Palm-Ramon Development Co.,* 63 Cal.2d 534, 540 [47 Cal.Rptr. 377, 407 P.2d 289]; *El Tejon Cattle Co.* v. *County of San Diego,* 64 Cal.2d 428, 431 [50 Cal.Rptr. 546, 413 P.2d 146].) There, as here, the record is silent as to any evidence by plaintiff with respect to the unreasonableness of the specific reduction which, Hayungs testified, was his "best judgment" in the circumstances.

The judgment in each case is affirmed.

Wood, P. J., and Fourt, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 29, 1968.