GEORGIA PACIFIC CORPORATION,
Plaintiff,

v.

The COUNTY OF MENDOCINO,
Defendant.

INTERNATIONAL PAPER COMPANY,
Plaintiff,

v.

COUNTY OF SISKIYOU, Defendant.

DIAMOND INTERNATIONAL CORPO-
RATION, Plaintiff,

v.

COUNTY OF TEHAMA, Defendant.

Nos. C-71 366, C-71 1722 and C-71 1723.

United States District Court,
N. D. California.

April 5, 1972.

Cooley, Crowley, Gaither, Godward, Castro & Huddleson, Paul A. Renne, Andrew Kopperud and John D. Hoffman, San Francisco, Cal., for Georgia Pacific.

Pillsbury, Madison & Sutro, Geo. A. Sears and John H. Hall, San Francisco, Cal., for International Paper Co. and Diamond International Corp.

Bagshaw, Martinelli, Corrigan & Jordan, with Leland H. Jordan, San Rafael, Cal., for defendants.

## OPINION AND ORDER DENYING PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

WOLLENBERG, District Judge.

### STATEMENT OF FACTS

The three cases in which this decision on plaintiffs' motions for Summary Judgment is rendered were related and consolidated for the purpose of the motions. For the most part, a similar factual background gives rise to identical questions of law in each matter. In each, the defendant county assessed and levied a real property tax based upon what the Assessor of the county determined to be a possessory interest in National Forest lands, situated within the county. Whatever interest the plaintiff may have in these lands of the United States is created and transferred by timber contracts

entered into by the plaintiff, as a "timber operator", (or its assignor) and the Forest Service of the United States Department of Agriculture. The relevant terms of the various contracts are apparently identical although the contract involved in C–71 1723 (hereinafter "Diamond") is not part of the record. The contract gives the plaintiff the right to buy and to cut certain timber designated by the Forest Service, within a defined geographical area. The designations are made, in large part, prior to the signing of the contract, but it is clear that some designations may be made subsequently.

By the contract, "timber operator" is given the right to enter upon the National Forest lands for the purpose of cutting and removing the timber. In some instances, he is required to construct roads, culverts and other improvements, designed to facilitate access to the trees. In such instances, a schedule of reimbursement is agreed upon. The contract expressly provides that

"all right, title, and interest in and to any included Timber in this contract shall remain in Forest Service until it has been cut, scaled, and paid for, at which time title shall vest in purchaser. For purposes of this Subsection, timber cut under guarantee of payment by bond or deposited securities shall be considered to have been paid for." (Section B 8.11 of Timber Sale Contract, Standard Provisions).

Other provisions of the contract provide that payment in advance for all timber which will be cut in the next thirty day period will be required. (Section B 4.21, B 4.3.) Although it is not entirely clear, it would appear that title to substantially all timber cut would have vested prior to cutting, under that advance payment arrangement.

The contracts, awarded after bidding, give to the timber operator the exclusive right to the "included timber" in the designated geographical area for the term of the contract, which is, in each case, several years. The timber operator is not given the right to exclusive posses-

sion of the designated area by any express provision of the contract, but it is surely to be understood as an implied term that the Forest Service would not interfere with the operator's rights under the contract by impairing his ability to conduct his operations. (Cf. Section B 5.5: Use by others of Roads).

There are many other provisions of the contracts relating to pollution and fire suppression, rates of payment and specifications of timber which are not directly involved on this motion.

The tax was imposed in C–71 366 (hereinafter "Georgia") for the year 1970–71 and in C–71 1722 (hereinafter "International") and Diamond for the year 1971–72. This distinction gives rise to several differences in the argument made by plaintiffs in the cases, although the differences are not major in relation to the many points which are the same in each. The procedural posture in which the plaintiffs find themselves is different, presumably for the same reason. The plaintiff in Georgia has exhausted all possibilities of administrative relief, and has, in fact, filed an action in the Superior Court of California, County of Mendocino, seeking relief identical to that sought here. The other plaintiffs have not as yet completed the administrative relief they sought.

In each case, the challenged tax has, in fact, been paid in full under protest by the plaintiff. Each seeks, as a part of the relief here requested, a refund of that tax.

### JURISDICTION

Plaintiffs assert jurisdiction both on the basis of diversity of citizenship, and upon the existence of a federal question. 28 U.S.C. §§ 1332(a), 1331(a). The amounts involved, exclusive of interest and costs, exceed $10,000 in each case. It is clear that the facts do support the exercise of jurisdiction based upon diversity. It is not necessary, therefore, to determine the matter of federal question jurisdiction, and the problems that might arise were jurisdiction founded

solely upon that latter basis do not arise.[1] It is clear that California does provide for recovery of taxes paid under protest,[2] and that right is enforceable in Federal court exercising jurisdiction based upon diversity.

## ABSTENTION

■ At the hearing of this motion, the Court raised the issue of whether or not it was appropriate for this court to act in this matter. That question was based upon: 1) the well-developed and firmly established policy of federal courts exercising their equitable jurisdiction to refrain from acting in matters challenging state taxes and 2) the prayers of each of the complaints which seek what must be understood as declaratory relief, as well as refund of the taxes paid.

Title 28 U.S.C. § 1341 bars federal courts from enjoining the collection of state-imposed taxes so long as there is a plain, adequate, and efficient remedy under state law. There can be no question but that California does provide a remedy which is plain, adequate and efficient. The Supreme Court made it clear that the statutory enactment merely codified part of the long-standing judicial policy, and held that declaratory judgment actions were comprehended within the ban against equitable relief. Great Lakes Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943).

It is quite clear that all parties to this litigation are concerned with the impact of a decision here on the course of future events. It is no doubt for that reason that the prayers for relief were framed as they were. A determination here that the tax is valid or invalid will unquestionably affect the planning of both parties with respect to many future years. The relationship between the parties can be expected to continue for several years under these contracts, and may well continue after that under other timber contracts.

While the primary impact may be in the future, it is, however, undeniable that taxes were paid, under protest, by all of the plaintiffs and recovery of those payments is now sought in these actions. The amounts paid are substantial. Fairly characterized, these actions are in the nature of "test litigation" rather than declaratory judgments. Though many questions might be raised as to the *wisdom* of allowing the parties to litigate complex and involved questions of state tax law in federal court, it is clear that diversity jurisdiction does afford them that right. Considered as a suit for refund of taxes paid, there is no basis for this court's abstaining. Defendant counties have been able to cite the court to only one case in which it was held that the judicial policy of refusal to act applied to suits in which refund of taxes actually paid was sought. Gray v. Morgan, 251 F.Supp. 316 (W.D.Wis. 1966). The statement in that opinion must be considered to have been part of the holding of that court, but it does not appear to have been carefully considered. The opinion was in the main concerned with the aspects of plaintiff's complaint seeking equitable relief. It considered the prayer for refund only in passing. The decision was affirmed by the Seventh Circuit, 371 F.2d 172 (1966), but the point of the refund was not discussed in the Court of Appeals decision at all. The contrary line of authority is strong. The point has been considered in all of the following cases: Southland Mall, Incorporated v. Garner, 293 F.Supp. 1370 (W.D.Tenn.1968); Rico Argentine Mining Co. v. Board of County Com'rs, 215 F.Supp. 208 (D.Colo. 1963); and Central Steel and Wire Co. v. City of Detroit, 99 F.Supp. 639, 101 F.Supp. 470 (E.D.Mich.1951). In each of those cases, the distinction was made between suits for refund and suits seek-

---

1. If solely on Federal question jurisdiction, there would arise the issue of whether the tax were sufficiently shown to be an involuntary payment so that suit would lie here for its recovery. See, Mahno-men County v. United States, 319 U.S. 474, 63 S.Ct. 1254, 87 L.Ed. 1527 (1943), and cases there cited.

2. California Rev. and Tax.Code § 5138.

ing simply declaratory relief. The rationale of those cases is persuasive; the future impact notwithstanding, diversity jurisdiction allows the plaintiffs to seek their refund here in what amounts to a simple action for damages. Because of the disposition made on these motions, it is unnecessary to consider the further question of the appropriateness of entering a declaratory judgment if the plaintiffs prevail, in addition to the judgment for the taxes paid.

■ The fact that the plaintiffs in International and Diamond have not completed the administrative process which they initiated to recover the taxes paid does not bar them from proceeding here. There is some question that California law contemplates any administrative relief in cases in which it is contended that there is no basis for the tax imposed, as distinguished from cases raising issues of valuation. See, Board of Supervisors of County of Modoc v. Archer, 18 Cal. App.3d 717, 96 Cal.Rptr. 379 (1971). It is clear, however, that when the challenge is based upon the question of taxability that there is at least no need to exhaust the administrative procedure of application to the Board of Equalization. Security First National Bank of Los Angeles v. Los Angeles County, 35 Cal. 2d 319, 217 P.2d 946 (1950), and cases there cited. In these cases, the issues presented on the motions for summary judgment are: 1) whether there is any taxable interest held by plaintiff 2) whether federal legislation bars imposition of any tax by the state and 3) whether the tax imposed unconstitutionally discriminates against the United States or those claiming under it. Those issues are not concerned with valuation, but with the validity of the tax as a whole. Exhaustion of administrative remedies, assuming they exist, is not required.

■ Plaintiff in Georgia has stated that its resort to state court by the filing of a complaint seeking the relief sought here was premised upon "an abundance of caution" in view of the short statute of limitations imposed on

such state actions. The filing of that complaint does not either deprive this court of jurisdiction, or necessarily counsel abstention. Nothing beyond the filing of the complaint in that action has been done by plaintiff there, and it appears that Georgia's intention is to litigate the matter in this court. There does not appear to be any reason to abstain at this time. See, Kline v. Burke Const. Co., 260 U.S. 226, 230–231, 43 S.Ct. 79, 67 L.Ed. 226 (1922), and the cases cited therein.

## THE TAXABILITY OF PLAINTIFFS' INTEREST

■ The plaintiffs have urged that however the interest of the timber operator under contracts with the Forest Service may be characterized, it cannot be a "possessory interest" as defined by Calif. Code of Rev. and Tax. § 107. It nowhere appears in either the briefs of plaintiffs or defendant why these interests must be classified as possessory interests in order to be taxed. Article IX, Section 1 of the California Constitution provides that *all* property, not exempt, shall be taxed. Similarly California Rev. & Tax. Code (hereinafter "R & T") § 201, provides that all property, not exempt, is "subject to taxation". The relevant inquiry would seem to be, therefore, whether the interest of the plaintiffs is "property", not whether it is the peculiar species of property denominated "possessory interest". Although the issue has not been briefed, an examination of the statutory scheme indicates that the classification of possessory interest is important to a determination of 1) whether the property is to be carried on the secured or unsecured assessment roll and 2) to some extent, methods of valuation. See R & T §§ 107, 107.1, 107.4. That an interest is determined not to be possessory does not necessarily mean that it is not taxable as non-exempt property.

"Property" is defined by R & T § 103, "real property" by § 104 of that Code.

"Real estate" or "real property" includes . . . (b) All mines, miner-

als, and quarries in the land, all standing timber whether or not belonging to the owner of the land, and all rights and privileges appertaining thereto. . . ." R & T § 104.

It would seem that if the interests of the plaintiffs may be classed as a right and/or a privilege appertaining to standing timber, then such interests would be taxable absent some basis for exemption.

As noted above, however, both parties have chosen to argue the much narrower question of whether the interest constitutes a "possessory interest". It may well be that the defendant felt bound by the characterization placed on the interest by the county Assessor, although an error in classification would surely be no support for the proposition that the interests were not taxable at all. Defendants' position may also be explained by the tendency in California historically to classify any interest which was "on" the lands of the United States, but was determined taxable nonetheless, as "possessory".

This court does not deem it appropriate in a matter of such complexity to reach beyond the briefs for a ground upon which to base its decision on the motions for summary judgment, and it does not appear in any event that the decision would, on these facts, be affected by a refusal to go beyond the points briefed and argued.

■ In determining whether the plaintiff's interest in each case constitutes a possessory interest, it is clear that this court must look to the law of California to determine the question. Regard must be had for the manner in which the Supreme Court of California would determine the question if it were presented to it. Commissioner of Internal Revenue v. Estate of Bosch, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). In reaching that determination, the decisions of intermediate state courts, although not binding, are to be given proper regard.

Counsel has cited no decision, and research has disclosed none, in which the California Supreme Court has passed on the issue presented: the taxability of the purchaser's interest in standing timber, if any, under a Forest Service contract. The short opinion of the Washington Supreme Court in Skate Creek Logging Co. v. Fletcher, 46 Wash.2d 160, 278 P.2d 1009 (Wash.1955), which held that the interest was not taxable does not make clear whether the decision was made solely on the basis of that court's understanding of Federal law, or whether peculiar features of Washington state tax law may have had an effect. In the absence of any information on those relevant considerations, there is little basis for assuming that the effect of *Skate Creek* would be substantial in determining the issue of taxability as a possessory interest under California law.

On the other hand, the Supreme Court's decision in El Tejon Cattle Co. v. County of San Diego, 64 Cal.2d 428, 50 Cal.Rptr. 546, 413 P.2d 146 (1966), by a unanimous court, would without question be an important precedent. There the court dealt with the method of valuation employed in assessing what had been determined to be a possessory interest created by a grazing lease on tax exempt property, the fee owner of which was an irrigation district. It is true, as plaintiffs note, that the proposition that the interest under the lease was "possessory", was apparently not seriously contested by the taxpayer there. The decision did clearly consider the nature of the lessee's interest, however, and analyzed the various rights that he had under the lease. In holding that the valuation was proper, the court necessarily determined that the interest was properly classified by the assessor. In that regard, it is important to note that the decision acknowledges that the taxpayer did not have exclusive possession of the land. There, as here, other parties were able to enter upon and utilize the land for various purposes, none of which were necessarily in conflict with the purposes for which the taxpayer

used the land. It does seem clear that the California Supreme Court would not insist today that an interest must be such as to exclude all others from the subject property in order to be classed as a possessory interest. Compare, Kaiser Co. v. Reid, 30 Cal.2d 610, 619, 184 P.2d 879 (1947). Although it is not entirely clear, *El Tejon* would seem to stand for the proposition that an interest in real property is taxable as "possessory" so long as the holder of the interest is protected from interference by other users. It may well be that various uses are quite compatible with each other, e. g. grazing with hunting and export of water in *El Tejon*, or lumbering with recreational uses here. An examination of the contracts here in question make it clear beyond doubt that plaintiffs have the exclusive right to purchase the designated timber contained on the land covered by these agreements for their term. There is no other timber purchaser to interfere with their use of the land or to challenge their interest in the standing timber. The fact that many restrictions may have been imposed governing the manner in which these valuable lands are used does not compel a conclusion that the interest granted is not a substantial and valuable one.

It is to be expected that the California Supreme Court would consider the recent holding of the Third District Court of Appeals in Board of Supervisors v. Archer, 18 Cal.App.3rd 717, 96 Cal.Rptr. 379 (1971), hearing den'd. The court there considered the taxability of the interest conveyed by Federal grazing permits, as well as agricultural leases. Although it was clear with respect to each permit and lease that others could be given the *same* rights on the *same* land, which is clearly not the case here, the court concluded that the "very remote danger" of the grantees interfering with the rights of each other "must not be used to cloud the fact that the permittees are presently enjoying use of the

federal lands for thier [sic] cattle for the duration of the permit". It cannot be said that the decision in *Archer* goes so far beyond the Supreme Court's own decision in *El Tejon*, that that latter court would not, in all probability, follow the same rule.

The decision in County of Los Angeles v. Continental Corporation, 113 Cal.App. 2d 207, 248 P.2d 157 (1952), hearing den'd, would only support the trend of the previously cited decisions. That case involved permits for extraction of oil and gas from public lands. The Court held that the parties could not control, by title of the instrument, the interest created, and found that it at least created a profit *a prendre*, which was taxable under § 107.

That the parties provide that *title* to timber shall not pass until the trees are cut, scaled, and paid for does not determine the question regarding existence of a possessory interest founded upon the dual factors urged by defendants: 1) plaintiffs' rights in the standing timber, and 2) the right given plaintiffs to go upon the federal land for the purpose of removing the timber.[3] A similar provision was in the permit agreement involved in the *Continental Corp.* case, supra, and did not prevent a determination that valuable rights in the land had been conveyed. Title cannot control all aspects of taxability, as plaintiffs acknowledge. It seems clear that personal property taxes, conceded by all to be valid, are levied upon the cut logs prior to scaling by the Forest Service, and prior, therefore, to passage of title. So it is here; the extent and nature of the rights held by plaintiffs, not the question of title, are determinative.

Counsel for plaintiff in Georgia makes an argument based upon a construction of R & T §§ 104 and 107 in support of its position that there is no possessory interest. Essentially, the argument rests upon the fact that § 107, in setting forth a definition of possessory interest,

---

3. As previously noted, it would appear that substantially all timber was, in fact, paid for in advance of cutting in compliance with the terms of the contract.

essentially copies sub-sections (a) (dealing with "land") and (c) (dealing with "improvements") of § 104, but omits sub-section (b) which is concerned with "mines, minerals, and quarries in the land, all standing timber whether or not belonging to the owner of the land, and all rights and privileges appertaining thereto". Arguing that the omission must be considered deliberate, counsel concludes that the Legislature must have intended to prohibit any possessory interest taxation respecting timber. The difficulty with the argument is that it proves too much. Along with timber, there is included within the scope of § 104(b) mines and minerals. It is clear beyond doubt that California does assess possessory interest taxes upon some mineral interests. The very wording of § 107 clearly evidences an understanding that interests under hydrocarbon mineral leases would be treated as possessory interests, absent the special exception created in the second paragraph thereof.[3a] See, Atlantic Oil Company v. County of Los Angeles, 69 Cal.2d 585, 597, 72 Cal.Rptr. 886, 893, 446 P.2d 1006 (1968). See also, Delaney v. Lowery, 25 Cal.2d 561, 154 P.2d 674 (1944). The discussion in *Delaney*, with respect to the construction to be given the word "land", although not concerned directly with § 107(a), is certainly persuasive authority for the proposition that the California Supreme Court would not construe § 107 as excluding from its scope everything described in § 104(b), but might well treat interests in timber as "rights to possession of land".

The conclusion must be that as a matter of California law, the interests of the plaintiffs created by the timber contracts with the Forest Service are taxable as possessory interests. It is now necessary to consider whether such taxation is barred, as plaintiffs also urge by the provisions of 16 U.S.C. § 500, by the constitutional prohibition against discriminatory taxation of interests of the United States, both matters of Federal law, or whether taxation is barred by any provision of California tax law.

## THE IMPACT OF 16 U.S.C. § 500

■ Title 16 of the United States Code, § 500, entitled, "Payment and Evaluation of Receipts to State for Schools and Roads" provides that twenty-five percent of all moneys received from each National Forest is to be paid to the state in which the forest is located to be expended by the state legislature "for the benefit of the public schools and public roads of the county or counties in which such national forest is situated. . .". Plaintiffs urge strenuously that that provision, particularly in light of its legislative history, must be understood as an expression of Congressional intent that no tax should be assessed on any interest in National Forest lands. It is urged at one juncture that by enacting

---

**3a.** § 107. *Possessory interests; security for payment of taxes; seizure and sale for delinquent taxes; suit against assessee.*
"Possessory interests" means the following:
(a) Possession of, claim to, or right to the possession of land or improvements, except when coupled with ownership of the land or improvements in the same person.
(b) Taxable improvements on tax-exempt land.
   Except as provided in this section, possessory interests shall not be considered as sufficient security for the payment of any taxes. Leasehold estates for the production of gas, petroleum and other hydrocarbon substances from beneath the

surface of the earth, and other rights relating to such substances which constitute incorporeal hereditaments or profits a prendre, are sufficient security for the payment of taxes levied thereon. Such estates and rights shall not be classified as possessory interests, but shall be placed on the secured roll.
   In the event of delinquency in the payment of any installment of taxes on such leasehold estates or rights, they shall be subject to seizure and sale in the same manner as provided for the seizure and sale of possessory interests in Sections 2914 to 2919, inclusive, at any time within three years after the delinquency. Suit may be brought against an assessee of such taxes in the event of delinquency in the payment thereof.

§ 500 Congress "pre-empted" the field [4] and again that the receipt of payments under provisions of § 500 make the assessment of taxes on plaintiffs' possessory interests "double taxation" in contravention of California R & T § 102 [5] and, presumably, elemental standards of fair play and substantial justice inhering in our system of jurisprudence. Unfortunately, the maxims do not solve the case, nor do such characterizations substantially aid in the analysis of the problem.

■ The language of § 500 contains not one word regarding its impact on state taxes levied on private interests in National Forests. It is elemental, however, that due regard must be given to other statutory enactments bearing on the same subject in construing a particular provision. What has been codified as § 500 was originally enacted by the Act of March 4, 1907, c. 2907, 34 Stat. 1270. That provision directed payment of ten percent of revenues to the states. The amount was later increased to twenty-five percent by the Act of May 23, 1908, c. 192, 35 Stat. 260. These provisions followed by more than a decade the creation of the National Forests in 1891. In 1897, certain provisions were enacted regarding those forests. Specifically, the Act of June 4, 1897, ch. 2, § 1, 30 Stat. 36, provided in pertinent part:

> The jurisdiction, both civil and criminal, over persons within such reservations shall not be affected or changed by reason of the existence of such reservations, except so far as the punishment of offenses against the United States therein is concerned; the intent and meaning of this provision being that the State wherein any such reservation is situated shall not, by reason of the establishment thereof, lose its jurisdiction, nor the inhabitants thereof their rights and privileges as citizens, or be absolved from their duties as citizens of the State.

The provisions of the above quoted portion of the 1897 enactment is codified at 16 U.S.C. § 480. It is in conjunction with that provision, which by its terms provides that State jurisdiction shall continue over National Forest lands, that § 500 must be construed. Clearly, such provision does not mean that the Federal government is liable for real property taxes on its land assessed by the State, but defendants here do not need to argue that proposition to prevail. All defendants must do is show that private persons within National Forests are not exempt from tax on their interests by reason of the fact that the United States owns the underlying fee interest.

The provision codified as 16 U.S.C. § 480 does not deal explicitly with State taxing authority. By implication, it does allow taxes against persons holding interests in National Forest lands. That proposition is the clear holding of Wilson v. Cook, 327 U.S. 474, 66 S.Ct. 663, 90 L.Ed. 793 (1946). That case dealt with a tax the State of Arkansas levied on the privilege or license of severing timber, among other natural resources. The parties against whom the tax was there asserted held contracts with the United States for the purchase and severance of timber on National Forest reserves, which contracts provided that "title to all timber included in this agreement shall remain in the United States until it has been paid for, and scaled, measured or counted". The similarity of that provision to the one in the contracts to which plaintiffs are parties is, to say the least, striking. The statement of facts in the Supreme Court's opinion seems to make it clear that the Forest Service was entering into the same sort of contracts then as it is now, so far as the issues in this litigation are concerned.

The decision held, first, that the tax imposed on the severing party imposed no unconstitutional burden on the Federal Government, 327 U.S. at 485, 66 S.Ct. 663, and second, that by the terms of

---

4. Plaintiffs' Reply Brief in International and Diamond at p. 15.

5. Plaintiff's Opening Brief in Georgia, p. 20.

what is now § 480, Congress declined to accept exclusive jurisdiction over the area of the National Forest, and that the state, therefore, has "territorial jurisdiction to lay the tax upon activities carried on within the forest reserve purchased by the United States". 327 U.S. at 487, 66 S.Ct. at 670. The conclusion that the state has "legislative jurisdiction" to levy the tax extended both to land which was in the public domain at the time Arkansas was granted statehood, as well as to land thereafter acquired by the United States.

That decision construed both the Federal legislation and the legislation of Arkansas which consented to the purchase of certain lands for National Forest purposes. Since the parties have not cited any legislation of California consenting to the purchase of any of the lands on which the plaintiffs hold timber contracts, and have not sufficiently identified those lands to permit a determination of the existence of such legislation, and if so, of its provisions, the Court is unable to resolve the question here precisely in the manner the Supreme Court used in Wilson v. Cook, supra. It is at least doubtful that any act of the Legislature of California could effectively give up jurisdiction in the face of the provisions codified in § 480, but that is not the issue that the plaintiffs have raised here, and need not be decided.

The issue here is not, after all, whether California has retained jurisdiction to tax private interest in these lands, but whether the provisions of § 500 bar imposition of the challenged tax. Section 480 bears on the issue to the extent that it illuminates the legislative purpose of

§ 500. It is impossible to accept plaintiffs' position that § 500 by implication bars the tax when it is part of a statutory scheme which, by another provision, has been held to authorize the imposition of tax on private interests in National Forests. Plaintiffs urge the court to consider the legislative history of § 500. There is nothing in the Congressional debates cited which indicates any intention to limit the provisions of what is now § 480. The dialogue centers around the undisputed fact that no tax can be levied on the interest of the United States in these lands. It simply does not consider the taxability of private interests.

In 1911, further lands were authorized to be added to the National Forest system by the Act of March 1, 1911, ch. 186, 36 Stat. 961. Section 12 of that Act, 36 Stat. 963,[6] contained the substance of the earlier act maintaining state jurisdiction, and § 13 of the same Act provided that five percent of the revenues be paid to the state in which the forest was located for roads and schools.[7]

Any question that might have existed earlier with respect to an inadvertent failure or an unspoken intention to repeal or alter the provision continuing state jurisdiction by authorization of payments for schools and roads is thus overcome. Congress had the question before it, and resolved the issue, for the same provisions are again enacted, but in this latter instance as companion features, §§ 12 and 13, of the same Act. The provisions of § 500 have been considered and amended by Congress subsequent to the decision of the Supreme Court in Wilson v. Cook, supra.[8] There

6. Sec. 12. That the jurisdiction, both civil and criminal, over persons upon the lands acquired under this Act shall not be affected or changed by their permanent reservation and administration as national forest lands, except so far as the punishment of offenses against the United States is concerned, the intent and meaning of this section being that the State wherein such land is situated shall not, by reason of such reservation and administration, lose its jurisdiction nor the inhabitants thereof their rights and privileges as citizens or be absolved from their duties as citizens of the State.

7. The Act of June 30, 1914, c. 131, 38 Stat. 441 raised the percentage provided for payment to the county to 25 percent.

8. Act of April 24, 1950, ch. 97, § 17(b), 64 Stat. 87.

has certainly been, then, ample opportunity to correct by legislation the judicial construction allowing the states to tax private interests on National Forest land, but Congress has in fact done nothing to indicate its disapproval of such construction.

Consideration of the provisions of § 480, as construed by the Supreme Court, therefore bars any construction of § 500 which would limit the power of the state to impose a possessory interest tax on private interests in National Forest lands.

## THE EFFECT OF THE STATE TAXATION SCHEME ON FEDERAL INTERESTS

■ Plaintiffs argue that although the defendant counties have assessed as possessory interests the rights under timber contracts covering National Forest lands, and taxed the holders on that basis, those holding contracts in state forest lands are not so taxed. It is asserted in International and Diamond merely that the applicable Rules and Regulations of the State Board of Equalization do not provide for the assessment of those holding contracts on state forests.

The short answer to the argument that no provision is made for taxation of state land is simply that the cited Rules and Regulations, codified as §§ 21–28 of Title 18 California Administrative Code, simply have nothing to say with respect to the subject of identity of the fee holder. The Rules and Regulations clearly do not direct that Federal timber contracts give rise to possessory interests, nor that state contracts do not. A reading of the regulations could only convey the impression that it is the nature of the interest conveyed by the contract, not the governmental entity conveying, that is the relevant factor. By legislative mandate, the Uniform Rules took effect only on the lien date in 1971. They do not apply, therefore, to the tax challenged in Georgia, which was for the year 1970–71.

With respect to the year 1970–71 plaintiff in Georgia has no uniform, or apparently non-uniform, rules on which to base its claim of anti-federal discrimination. It must seek to establish, as a factual matter, a "pattern and practice" of discrimination in the administration of the tax. Plaintiff there attempts by affidavit to make a factual showing that no possessory interest tax was levied by the defendant county on those who did hold timber contracts in state forests situate within the county. The defendant county has submitted no answering affidavit, and its counsel did not contest the assertions made, but did not concede the point. The affidavits filed, simply do not establish that there is no triable issue with respect to whether or not the defendant county was guilty of proscribed discrimination. The fact that one timber contractor (who happens to be the plaintiff) was not taxed on a possessory interest arising from a state contract which is not part of the record, and the fact that plaintiff's affiants know of no timber operator who was so taxed on its interest in any state contract do not prove that the defendant was guilty of discrimination. That determination would probably not be possible until after a full trial.

Even assuming that the defendant counties had determined not to tax the interests of contractors in state forest lands, *and* that the state timber contracts conveyed what California tax law would treat as a possessory interest, it does not appear that the discrimination would be proscribed. The essential factor is that the federal government, or those claiming under it, must be treated worse than the state and those holding contracts with it. The plain fact is that possessory interest taxation is a field which is limited to those holding interests in property in which the fee interest is not taxed. There is no possessory interest tax assessed under California law against a lessee or a timber contractor who leases or contracts with a private owner of land, because the full value of the land is taxed to the fee own-

er, including the tax attributable to the possessory interest. The allocation between the two parties to the contract or lease of the taxes is a matter for agreement between them, with which the tax assessor is not concerned.

By reason of the provision of California Public Resources Code § 4654,[9] the State pays to the county in which a state forest is situated an amount equivalent to the property taxes that would be payable if the land were taxable, so far as the portion used for commercial forest production is concerned. By that legislation, the state places itself in the same position as a private landowner so far as revenues to the counties are concerned. The same adjustment between the state and those who contract with it for timber rights on apportionment of this payment can be made as if the fee holder were a private party.

Plaintiffs rely heavily upon Phillips Chemical Co. v. Dumas School Dist., 361 U.S. 376, 80 S.Ct. 474, 4 L.Ed.2d 384 (1959). That case does stand for the proposition that there could be no discrimination against the federal government *when there was no justification* for the disparity of treatment. One of the justifications offered by the defendant in that case was that the State could make up in the rent received from its lessees what it lost in tax revenue. The court's answer was succinct:

> Likewise, it is not enough to say that the State can make up in rent what it

loses in taxes from its lessees. What the State's *political subdivisions* lose in taxes from the *State's* lessees cannot be made up in this fashion. Other local taxpayers—including the Government's lessees—must make up the difference. [emphasis in the original] 361 U.S. at 384, 80 S.Ct. at 479.

The Supreme Court did not say the proffered justification *could not* be sufficient. It held it insufficient because the loss of taxes was not, in fact, able to be made up to the political subdivision. Here, the fact is that the county *is* paid and loses nothing by the arrangement. That the timber contractor pays directly in one instance and indirectly in the other does not establish that he does not pay when dealing with the State. It surely cannot be held on this record that the mandate of § 4654 does not enter into the fixing of the contract price.

Whereas the payments under 16 U.S.C. § 500 cannot, in light of the authoritative construction placed upon 16 U.S.C. § 480 by Wilson v. Cook be deemed in *lieu* of tax payments, that is precisely what the § 4654 payments purport to be, and are. The asserted claim that the payments from the United States under § 500 amount to more revenue paid to the county per dollar of timber contract receipts than does the State plan under § 4654 is not relevant. The generosity of the Federal sharing arrangement, quite likely bottomed on considerations of the delicate balance of State-

---

9. § 4654. *"Payments to counties in amounts equivalent to taxes, expenditure of amounts paid.* There shall be paid to each county in which lands acquired for state forest purposes are situated, out of funds hereafter made available for such purpose, an amount equivalent to taxes levied by the county on similar land similarly situated in the county in the same manner as provided in the Revenue and Taxation Code for secured property tax payments as long as the state continues to own the land. Determination of what constitutes similar land similarly situated shall be made by a committee consisting of the county assessor of the county in which the land is located, a representative of the

State Board of Equalization and a representative of the State Forester.

The money received by any county pursuant to this section may be expended by it for any proper state purpose not prohibited by the State Constitution."

(The preceding is the text of the section prior to Nov. 23, 1970; on that date the following amendment became effective and was incorporated following the first sentence of the section.)

"Such payments shall be based only upon the value of the forest lands used for purposes of continuous commercial forest production and not upon value of such forest land used for any other purposes, including any improvements on such lands."

Federal relationships in our Federal system, does not mandate that a less generous approach by the State be held constitutionally defective. Furthermore, assuming that difference in the amount paid could somehow be relevant, the record discloses that the *claim* of greater payments under the federal plan is no more than a claim. Plaintiffs' arguments and affidavits have not established to the Court's satisfaction the necessary comparability upon which the asserted payments can be studied.

The plaintiffs' argument that discrimination against the United States and those claiming under it arise by reason of the manner in which Article XIII, § 12¾ of the California Constitution is applied is simply unsupported by the necessary factual showing. It is asserted by way of argument in one case that the benefits of that section are applied to "owners of private forest lands" [10] and then again that "[t]imber in state forests is afforded the benefit of such property tax exemption." [11] Whichever it is, if either, cannot be determined. Nor can it be determined what basis the defendant counties may have for the actual application of the exemption provision. Section 12¾, by its terms, provides an exemption for *immature* forest trees under certain conditions. Apparently, the Attorney General is of the opinion that the provision extends to *mature* trees under some circumstances. That fact does not compel the conclusion that the exemption would be applicable with respect to those timber contracts held by plaintiffs. Similarly, there is nothing to support the proposition that that provision is applied to state forest lands. It need not now be determined therefore, what the legal effect would be if the assertions made were established.

## THE IMPLICATIONS OF CALIFORNIA GOVERNMENT CODE § 15606(f)

Counsel in Georgia has argued that California Government Code §

15606(f), enacted in 1968, and amended in 1969, bars the taxation of possessory interests created by the Forest Service timber contracts for the year 1970–71. That section of the Government Code prescribes certain duties of the State Board of Equalization. It is not directed to the Assessor of the defendant county, the official charged with the duty of assessment. The provisions added by Stats.1968, c. 771, now constituting subdivision (f), as amended, simply direct the State Board of Equalization to refrain from issuing Rules and Regulations relating to the taxation of possessory interests until a specified date. It is apparent from the sections of the 1968 enactment which were not codified that the Legislature was concerned with the piecemeal *enactment* of possessory interest rules by the *State Board.* It was not the intent of the Legislature to impose a restriction upon the county assessors regarding their duty to assess all taxable property within the county, pursuant to the mandate of California Rev. & Tax. Code § 201 and Article IX, § 1 of the California Constitution, that all property not exempt shall be taxed. Section 3 of Stats.1968, c. 771 explicitly provides: "Nothing in this act shall be construed as exempting any possessory interest subject to taxation." The wording of that provision says as clearly as the Legislature could that the legislation does not render any taxable property tax-exempt. Unless it is tax-exempt, the county Assessor must assess it, and it must be taxed.

Plaintiff argues that the phrase "subject to taxation" in Section 3 of c. 771, quoted above, must be construed to mean, in effect, "of a class of possessory interest which was in fact being taxed at the time this section is enacted". No support is cited for such a strained construction of a clear provision. "Subject to taxation" must be understood in conjunction with the statutory and constitutional provisions cited, both of which render all non-exempt property subject

10. Plaintiffs' Memorandum in Support of Motion filed in International and Diamond, p. 14, ln. 19.

11. Plaintiffs' Closing Memorandum filed in International and Diamond, p. 18, ln. 5–6.

to taxation. The assertion made, by way of argument, that, as a matter of fact, no county was assessing the interest held under Forest Service timber contracts as possessory interests, assuming that unsupported assertion to be true, may mean many things, but it does not mean that those rights were previously exempt from taxation. Nothing changed in the property tax law which would have affected the taxability of these interests in 1971. What did change in 1970, according to plaintiff's assertion, was the practice of the Assessor of the defendant county in assessing the interest. By that means, property subject to taxation became actually taxed. Section 15606 (f) has no bearing on the validity of the tax levied for the year 1970–71, the year challenged in Georgia.

## CONCLUSION

Based upon the foregoing considerations plaintiffs' motions for summary judgment in each of these matters must be denied. It is so ordered.